# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
       )
       Plaintiff,       )
       )
       v.       )       No. 19-03161-02-CR-S-RK
       )
JERRY R. WHEELER,       )
       )
       Defendant.       )

## REPORT & RECOMMENDATIONS

Before the Court is Defendant Jerry R. Wheeler's Motion to Quash Search Warrant and Suppress Evidence on the Basis of an Unlawful Search and Seizure under the Fourth Amendment to the United States Constitution. (Doc. 348.) This action has been referred to the undersigned for the purpose of submitting a report on any pretrial motions for suppression of evidence. As follows, it is **RECOMMENDED** that the Motion be **DENIED**.

## I.      Background

Defendant has been charged by Superseding Indictment with one count of conspiracy to distribute one kilogram or more of a mixture or substance containing heroin and/or 400 grams or more of a mixture or substance containing fentanyl, one count of knowingly possessing a firearm in furtherance of said conspiracy, and one count of knowingly possessing a firearm as a felon. (Doc. 195.)

Defendant moves to quash the search warrant issued on November 13, 2019, and executed on November 14, 2019, at 3431 South Farm Road 129, Springfield, Greene County, Missouri, and to suppress "any and all evidence obtained as a result thereof, including any statements made

subsequent to and in connection with said search warrant." (Doc 348 at 1.)  In support, Defendant claims that the search warrant "was issued without the requisite probable cause."  *Id.*

The Government opposes the relief requested, arguing the "warrant affidavit contained sufficient facts for the issuing magistrate to conclude there was probable cause." (Doc. 353 at 4.)  In reliance on *United States v. Leon*, the Government further asserts that "even if the Court concludes the warrant is in some way deficient, evidence gained following its execution should not be suppressed because law enforcement acted in good faith and objectively reasonable reliance on the warrant." *Id.* (*citing United States v. Leon*, 468 U.S. 897 (1984)).  In his reply, Defendant claims the *Leon* exception should not apply, arguing there were several material omissions in the warrant affidavit and suggesting that "a *Franks* hearing may now be in order." (Doc. 356 at 6-7.)

An evidentiary hearing on the Motion was held on February 23, 2021.  (Doc. 369). Defendant appeared in person with his attorney, Stacie Bilyeu, and the Government was represented by Assistant United States Attorney Byron Black.  *Id.*  Law enforcement officer Nicolas Mittag appeared and testified.  *Id.*

## II.     Findings of Fact[1]

As of the hearing date, Nicolas Mittag was employed by the Springfield Police Department for almost 20 years and had been assigned to the DEA as a Task Force Officer for the last four years.  For the last 12 years, his primary assignment was to investigate drugs, gang activity, illegal firearms and violent offenders in Springfield, Missouri.  TFO Mittag has received training on narcotics investigation, including at least four 40-hour training courses on drugs, gangs and gun violations, two heroin death investigation conferences, an advanced wiretap course, and the DEA clandestine lab certification course.  TFO Mittag has personally investigated over 500 drug

---

[1] The facts set forth herein are taken from the testimony adduced and the exhibits admitted at the hearing on the instant Motion. The Government's exhibit index appears as doc. 370. The hearing transcript appears as doc. 372.

possession, distribution and conspiracy cases, including cases involving heroin and fentanyl, and assisted in over 1000 such cases. TFO Mittag has conducted six Title III wiretap operations during which he listened to intercepted phone calls between individuals who were believed to be involved in the distribution of controlled substances. In his experience, when such individuals discussed non-illegal matters such as food or shoes, they referred to those items explicitly, but when they discussed controlled substances, they referred to those items vaguely, using terms such as "some."

In 2019, TFO Mittag began investigating a drug trafficking organization allegedly distributing heroin and fentanyl. The investigation utilized physical and electronic surveillance, including a wiretap operation focusing on Defendant that lasted one to two months.

### A.     The warrant application and affidavit

Toward the conclusion of the investigation, TFO Mittag applied for a warrant to search Defendant's residence, 3431 South Farm Road 129, Springfield, Greene County, Missouri, for evidence of a crime and contraband, including controlled substances, specifically heroin and/or fentanyl, documents relating to the trafficking of controlled substances, financial records, money, tools used to distribute and consume controlled substances, and weapons. TFO Mittag drafted an affidavit in support of the warrant application, which was reviewed by AUSA Black on or about November 9, 2019. The warrant application was then presented to a magistrate judge of this Court for review.[2] On November 13, 2019, the magistrate judge granted the warrant application and issued the search warrant. The warrant was executed on November 14, 2019, and evidence, including firearms, ammunition, documents and various powdery or rocklike substances, was found.

---

[2] The undersigned was the magistrate judge to whom the warrant application was presented.

3

In the 34-page warrant affidavit, TFO Mittag stated that based on his training and experience, persons involved in the distribution of controlled substances keep and/or conceal in their residences: (a) records relating to the transportation, ordering, and/or distribution of controlled substances; (b) contraband, proceeds and records, for ready access and to conceal them from law enforcement; (c) drugs, currency and other assets which are proceeds from drug sales; (d) equipment for packing, cutting, weighing and distributing controlled substances; (e) contact lists of sources, customers and associates related to drug trafficking; (f) photographs and video recordings of associates, assets and controlled substances; (g) records of domestic and foreign travel; (h) firearms to protect themselves from other drug traffickers and law enforcement officers; and (i) cell phones with contact lists to arrange drug transactions.

Regarding the investigation, TFO Mittag asserted that on January 15, 2019, during a traffic stop, a Kenneth Crawford was found to be in possession of 42 grams of suspected heroin, a "distributive amount." Mr. Crawford voluntarily admitted he purchased an ounce of heroin every other day from Defendant.

On January 18, 2019, during a traffic stop, a William Leath was found to be in possession of suspected heroin. Mr. Leath admitted he purchased 7-8 grams of heroin for distribution every couple days from a male named "Jerry," or "Love," a known moniker of Defendant. On February 13, 2019, Mr. Leath was observed meeting with Defendant. During a traffic stop shortly thereafter, Mr. Leath was found to be in possession of 3 grams of a substance which field tested positive as heroin. Mr. Leath voluntarily admitted he had just purchased the heroin from Defendant.

On April 3, 2019, a Laurel Lindsey was observed meeting Defendant's son and co-defendant, Jerry Bedell. Ms. Lindsey was contacted after the meeting and found to be in possession of 3 grams of a substance which field tested positive as heroin. Ms. Lindsey admitted

4

she had purchased the heroin from Mr. Bedell. She further admitted she had previously purchased heroin from Defendant, but that Mr. Bedell was now selling heroin for Defendant. The next day, April 4, 2019, Defendant was found to be in possession of $8,605 in U.S. currency, some of which was marked currency that had been used by Ms. Lindsey to repay a drug debt to Mr. Bedell.

On May 14, 2019, TFO Mittag observed Defendant meet with co-defendant Sheron Loggins in Springfield for nine minutes. Based on his training and experience, TFO Mittag stated that meetings for drug deliveries are often brief. Upon leaving, Mr. Loggins got gas then drove east on I-44 toward St. Louis, Missouri. Mr. Loggins was stopped in Phelps County and approximately $15,000 in U.S. currency was found in the vehicle. Mr. Loggins was released along with the currency, and he continued east toward St. Louis.

On July 3, 2019, Mr. Loggins's phone location data indicated he was travelling from St. Louis to Springfield. Mr. Loggins was observed meeting briefly with Defendant in Springfield, then he returned to St. Louis immediately. Based on his training and experience, TFO Mittag stated drug couriers often meet with drug distributors in this manner in a short time frame then return from where they came.

On August 12, 2019, Defendant was observed meeting with Mr. Bedell for 14 minutes carrying a small black backpack. Based on his training and experience, TFO Mittag believed Defendant had delivered heroin to Mr. Bedell.

On August 16, 2019, Mr. Loggins's phone location data indicated he was travelling from St. Louis to Springfield. Later that evening, TFO Mittag observed Mr. Loggins meet with Defendant at 3431 South Farm Road 129. Mr. Loggins then drove to a motel and was back in St. Louis the next afternoon per his phone location data. Based on this meeting, TFO Mittag believed Mr. Loggins had delivered heroin to Defendant at 3431 South Farm Road 129.

On September 3, 2019, Mr. Bedell received a phone call from a Jasmine James, who stated she was trying to "bump" into him. Mr. Bedell replied, "You have to wait a minute. Hey, I'm dry right now. I'm gonna run to the store." Eleven minutes later, Mr. Bedell called Defendant and stated he was "getting this shit together, bout to head your way." Approximately two hours later, TFO Mittag observed Mr. Bedell arrive at 3431 South Farm Road 129, approach the front door, which was opened by Defendant, and enter the location. A few minutes later, Mr. Bedell spoke with an Amber Blakemore on the phone, who asked Mr. Bedell, "Did you re-up," to which Mr. Bedell replied, "Yeah." The two then arranged a meeting and Ms. Blakemore said she needed, "a half." Mr. Bedell left the location 23 minutes after entering. While leaving, he spoke on the phone with co-defendant Nichole Bedell, stating he had been at his dad's to "handle some business." Based on his training and experience, TFO Mittag believed Mr. Bedell had received heroin from Defendant at 3431 South Farm Road 129.

On September 8, 2019, Mr. Loggins's phone location data indicated he was travelling from St. Louis to Springfield. He was stopped in Phelps County, Missouri, and during a search of his vehicle 496 grams of a substance which field tested positive as heroin was found and seized. Upon his release, Mr. Loggins's phone location data indicated he continued to Springfield, where intercepted phone calls led officers to believe he met with Defendant.

Four days later, on September 12, 2019, Mr. Bedell made statements to TFO Mittag that he sold a "zip" or ounce of heroin per day and worked for a person known as "Bane," which law enforcement believed to be a nickname for Mr. Loggins. Mr. Bedell said "Bane" had got caught on the highway in Phelps County, with "150 zips" and "that was that."

On October 27, 2019, Defendant spoke with an "Asia" on the phone. During their conversation, Defendant told Asia he was traveling to St. Louis, it would be on the spur of the

6

moment, and to not tell anyone when he was travelling. TFO Mittag believed Defendant was travelling to St. Louis to re-up his heroin supply and wanted to avoid letting law enforcement know of the trip.

On October 28, 2019, TFO Mittag intercepted a call between Defendant and an unidentified woman ("UF6955") wherein Defendant gave her directions to 3431 South Farm Road 129. Later that day, TFO Mittag observed UF6955 arrive at 3431 South Farm Road 129, where Defendant was standing in the driveway, conduct a hand-to-hand transaction with Defendant, then leave shortly thereafter. Based on his training and experience, TFO Mittag believed this brief hand-to-hand exchange between Defendant and UF6955 was a heroin sale.

On November 5, 2019, TFO Mittag intercepted another phone call between Defendant and UF6955, wherein she asked to borrow money. Because TFO Mittag had never known Defendant to have a legitimate source of income during the investigation, he believed that any money Defendant was able to lend to UF6955 was proceeds from the sale of heroin. Later that day, Defendant was observed meeting UF6955 briefly in the driveway of 3431 South Farm Road 129, although no hand-to-hand transaction was observed between them.

On the morning of November 7, 2019, Defendant's phone location data showed he was heading toward St. Louis, Missouri. In the very early morning of November 9, 2019, his phone location data showed he returned to 3431 South Farm Road 129. Later that morning, Defendant told a person on the phone, "I've got some shit that you'll really really like." In a separate phone call shortly thereafter, another person told Defendant, "I thinking about, I need probably need come to get at least two or three of those things." Based on the brief nature of this trip and the subsequent phone calls, TFO Mittag believed Defendant had travelled to St. Louis to obtain heroin.

Based on these facts as set forth in the warrant affidavit, along with his training and experience, TFO Mittag believed that Defendant was using his primary residence, 3431 South Farm Road 129, to keep contraband related to his heroin distribution business and to package heroin for distribution.

### B.    TFO Mittag's testimony

Over the course of the investigation, TFO Mittag intercepted approximately 20 phone calls between Defendant and UF6955.  However, TFO Mittag was never able to determine the nature of the relationship between Defendant and UF6955, nor did he learn UF6955's identity, as he considered her to be a "low-end user."  During the October 28, 2019 phone call between Defendant and UF6955, UF6955 told Defendant she couldn't stay long because she had to go to the gym. TFO Mittag did not include this statement in the warrant affidavit because he did not feel it was relevant, because whether she was "going to the gym or the grocery store or a movie, [] didn't change" what UF6955 and Defendant did in the driveway of 3431 South Farm Road 129.

### III.    Conclusions of Law

American citizens are protected from "unreasonable searches and seizures" by the Fourth Amendment. U.S. Const. amend. IV. "A violation of the Fourth Amendment usually triggers exclusion of evidence obtained by way of the violation from a subsequent criminal prosecution." *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014) (quoting *United States v. Barraza–Maldonado*, 732 F.3d 865, 867 (8th Cir. 2013)) (internal quotations omitted).

Defendant moves to suppress evidence gathered under a warrant to search his residence and also requests a *Franks* hearing in his reply brief.  He argues that the warrant affidavit is based on unsupported assertions and fails to show that any illegal activity took place at 3431 South Farm Road 129.  Defendant further asserts that law enforcement made factual omissions in the warrant

8

affidavit that misled the issuing judge, necessitating a *Franks* hearing. The Government responds that the warrant affidavit included sufficient information to support probable cause, and, if the warrant affidavit did not establish probable cause, law enforcement officers are entitled to the good faith exception under *Leon*. Upon review, the undersigned concludes there is no basis for relief under *Franks*, the warrant affidavit sufficiently established probable cause, and the *Leon* good faith exception applies.

### A.    Request for a *Franks* hearing

In his reply in support of the motion, Defendant claims that "law enforcement was reckless with some of its facts and made critical factual omissions" in the warrant affidavit, which misled the issuing judge, and argues that "a *Franks* hearing may now be in order." (Doc. 356 at 6-7.) "A search warrant may be invalid if the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). A *Franks* hearing regarding alleged omissions of fact is appropriate upon a showing that: "(1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (cleaned up). An omission is made with reckless disregard for the truth "when the material omitted would have been clearly critical to the finding of probable cause." *Id*. To justify a hearing, a defendant must make a "substantial preliminary showing comprised of specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007) (cleaned up). Mere

allegations are insufficient to warrant a *Franks* hearing. *United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009).

Defendant specifically alleges the warrant affidavit: (1) "failed to make it clear that Jerry Bedell is the Defendant's son"; (2) failed to include the fact that during the October 28, 2019 intercepted call, the unknown female "stated that she couldn't stay long because she was headed to the gym"; (3) failed to include the fact that "Defendant and the unknown female were in a personal relationship"; and (4) failed to state that "Defendant had given the unknown female money (not drugs) in the same speedy hand-to-hand fashion, days later, on November 5, 2019." (Doc. 356 at 5.)

Upon review, Defendant has not satisfied his burden under *Franks*, as none of the allegedly omitted information was clearly critical to a finding of probable cause. Further, inclusion of the allegedly omitted information would have no material effect on the finding of probable cause. Additionally, some of the allegedly omitted information is based only on allegations, with no evidence in support.

### 1.    Information that Jerry Bedell was Defendant's son

Defendant argues that TFO Mittag "failed to draw proper attention to the issuing Court" in the warrant affidavit that Jerry Bedell is Defendant's son. (Doc. 356 at 6.)

Contrary to Defendant's assertion, however, the fact that Jerry Bedell is Defendant's son was not omitted from the warrant affidavit. At least three direct references to this fact were included in the warrant affidavit, in descriptions of phone calls between Jerry Bedell and Defendant. (Ex. 1 at 19-20 ¶ 67, at 24 ¶ 85, at 28-29 ¶ 96.) And there is no indication that the issuing judge failed to carefully review the entire warrant affidavit. Consequently, the issuing

judge was made aware that Jerry Bedell is Defendant's son, and as a result this argument presents no basis for relief under *Franks*.

### 2. Information that the unknown woman was on her way to the gym

Defendant also asserts that the warrant affidavit omitted that "the unknown female had given a legitimate reason for her brief visit during her phone call immediately preceding her trip to Defendant's home on October 28, 2019 (she was on her way to the gym)." (Doc. 356 at 6.)

First, "[a] law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Technical Ordinance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001). TFO Mittag testified that he did not include UF6955's statement to Defendant that she couldn't stay long because she had to go to the gym because he did not think this fact was relevant to the brief meeting and hand-to-hand transaction in the driveway, and the undersigned agrees. First, the undersigned finds that this statement was not omitted with the intent to make the warrant affidavit misleading, nor in reckless disregard of whether the omission made the warrant affidavit misleading. Furthermore, even had this statement been included in the warrant affidavit, it would not change the fact that the meeting in the driveway was brief and included a hand-to-hand exchange, which TFO Mittag believed to be a drug transaction based on his training and experience. Defendant may claim that the brevity of UF6955's meeting was because she had somewhere else to be, but the brevity of the meeting is viewed as a factor in the totality of circumstances to determine whether there is probable cause regardless. Consequently, Defendant has failed to meet her burden under *Franks* here.

### 3. Information as to personal relationship between Defendant and unknown woman

Third, Defendant claims TFO Mittag failed to include in the warrant affidavit that "there was a personal relationship between the unknown female and Defendant." (Doc. 356 at 6.)

11

However, TFO Mittag was never able to determine the nature of the relationship between Defendant and UF6955, nor UF6955's identity, as she was considered to be a "low-end user" and was not a target of the investigation. Defendant has provided no evidence to the contrary, nor any support for the premise that there was a personal relationship between Defendant and UF6955. The warrant affidavit is presumed valid unless the defense provides evidence otherwise. Mere allegations of omissions are not sufficient to warrant a *Franks* hearing. *See Kattaria*, 553 F.3d at 1177. Accordingly, there was no omission of fact here, and the motion fails as to this basis.

### 4. Information regarding Defendant's two meetings with unknown woman

Lastly, Defendant argues the warrant affidavit fails to point out that "a mere few days after the interaction between the unknown female and Defendant on October 28, 2019 (on November 5, 2019), that Defendant had given the unknown female money in much the same manner" as on October 28, 2019. (Doc. 356 at 7.)

First, in the warrant affidavit, TFO Mittag states that on October 28, 2019, he

observed WHEELER and UF6955 conduct a hand-to-hand exchange and then UF6955 left the location. Although the reason why UF6955 was meeting WHEELER was unclear and there was no intercepted communication between the two stating her reason for the visit, I believe based on my training, experience, the hand-to-hand exchange, and brevity of the meeting, that WHEELER was selling UF6955 heroin.

(Ex. 1 at 25 ¶ 88.)

Then, TFO Mittag states that on November 5, 2019, a call was intercepted wherein UF6955 asked to borrow money and Defendant agreed to lend her money. *Id*. at ¶ 89. Twenty minutes later, TFO Estes observed Defendant "meet UF6955 in the driveway." *Id*. Six minutes after she arrived, "UF6955 got back into her vehicle and left the location." TFO Mittag added his belief that, "due to the fact that [Defendant] has no legitimate source of income, [] the money [Defendant]

12

gave to UF6955 is proceeds from the sale of heroin and that he is keeping the proceeds at" 3431 South Farm Road 129. *Id.* Based on the call made shortly before this meeting, TFO Mittag surmised in the warrant affidavit that Defendant had given UF6955 money during this meeting. However, TFO Estes did not actually observe any hand-to-hand transaction or exchange of money between Defendant and UF6955.

The undersigned finds no facts were omitted here. The warrant affidavit accurately describes the intercepted calls and meetings of October 28, 2019, and November 5, 2019, and no evidence was presented to contradict those descriptions. During the intercepted call between Defendant and UF6955 prior to their meeting and hand-to-hand exchange on October 28, 2019, there was no mention of borrowing or lending money. And, although TFO Mittag assumed, based on their phone conversation earlier that day, that Defendant gave money to UF6955 on November 5, 2019, no actual hand-to-hand exchange was witnessed on that date. As a result, although Defendant claims this was an omission of fact, he actually seems to be arguing that TFO Mittag should have compared these two interactions and reached different conclusions about their nature. This argument is not, however, supported by any omitted facts, and certainly provides no basis for relief under *Franks*.

### 5. Conclusion

Ultimately, TFO Mittag's description of these events in the warrant affidavit is sufficient. What "a facially valid warrant affidavit *might have contained* is simply irrelevant." *United States v. Smith*, 581 F.3d 692, 695 (8th Cir. 2009) (emphasis in original). First, three of the four allegedly omitted facts were either not omitted, or were not shown by Defendant to be more than mere allegation. As for the omission of UF6955's statement to Defendant that she had to go to the gym after their meeting, this omission was not done with the intent to mislead, or in reckless disregard

13

of whether it was misleading, and the omitted information was not clearly critical to the finding of probable cause. Further, adding this information to the warrant affidavit would have no material effect on the probable cause finding. Thus, because Defendant has failed to make a substantial preliminary showing in accordance with *Franks*, the undersigned concludes that Defendant's request for relief pursuant to *Franks* based on alleged omitted facts in the warrant affidavit should be denied.

### B. Probable cause

Defendant argues that the search warrant was issued without the requisite probable cause. To issue a warrant, the court must have had a "substantial basis" to find probable cause. *United States v. Green*, 954 F.3d 1119, 1123 (8th Cir. 2020). A warrant is valid when it "is supported by facts that would justify a prudent person in the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Thurmond*, 782 F.3d 1042, 1044 (8th Cir. 2015) (cleaned up). The decision of whether there is probable cause is determined only by the information contained within the four corners of the affidavit. *United States v. O'Dell*, 766 F.3d 870, 874 (8th Cir. 2014) (citation omitted). To support probable cause, a warrant application must establish a nexus "between the contraband being sought and the place to be searched." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009) (cleaned up). Using the totality of the circumstances, the issuing judge is required to consider "all the circumstances set forth in the affidavit before him" to consider whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A warrant affidavit "should not be assessed paragraph by paragraph; it must be evaluated as a whole." *United States v. Luloff*, 15 F.3d 763, 767 (8th Cir. 1994) (cleaned up).

14

The undersigned disagrees with Defendant's arguments, which pick out and attack specific incidents in the warrant affidavit but fail to consider these incidents within the context of all of the circumstances described in the warrant affidavit. In the undersigned's view, considering all the circumstances set forth in the four corners of the warrant affidavit, there was sufficient information to establish probable cause to search 3431 South Farm Road 129.

### 1. TFO Mittag's training and experience

First, the undersigned recognizes the importance of TFO Mittag's training and experience, as described in the warrant affidavit, in conjunction with his statements describing the surveillance of Defendant. There is not a per se rule establishing a nexus between a drug trafficker and his home; however, courts "have found probable cause to exist in cases in which officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity." *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) (citing *Luloff*, 15 F.3d at 768).

In the warrant affidavit, TFO Mittag begins by describing his training and experience as to the investigation of illicit drug trafficking. He then makes several relevant statements regarding the types of contraband and evidence of crimes that persons involved in illicit drug trafficking keep in their residences, "based upon [his] training, experience, and participation in the investigation and seizure of controlled substances." (Ex. 1 at 3-5 ¶ 5.) Upon review, TFO Mittag's training and experience, through which he has gained knowledge regarding the behavior and practices of persons involved in illicit drug trafficking, contributes to the totality-of-circumstances and supports the belief that contraband and evidence of a crime would be found at 3431 South Farm Road 129.

### 2. The surveillance of Defendant

Defendant claims the warrant affidavit lacks facts sufficient to create a nexus between the items sought and Defendant's residence. Under the Fourth Amendment, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). Upon review, considering all of the circumstances set forth in the warrant affidavit, the undersigned concludes there was sufficient probable cause.

First, TFO Mittag described the January 2019 incident involving Mr. Crawford, who was found in possession of a large amount of heroin and admitted that he regularly purchased heroin from Defendant. Next, TFO Mittag described the February 2019 incident involving Mr. Leath, who was observed meeting Defendant, found in possession of heroin shortly thereafter, and admitted that he had just purchased the heroin from Defendant and that he did so regularly. Then, TFO Mittag described the April 2019 incidents involving Ms. Lindsey, who was found to be in possession of heroin and admitted she had purchased it from Defendant's son and alleged co-conspirator Mr. Bedell but had previously purchased heroin from Defendant. Shortly thereafter, Defendant was found in possession of a large amount of currency, including marked bills that Ms. Lindsey had given to Mr. Bedell to repay a drug debt. These incidents all provide support for the conclusion that Defendant was distributing heroin with Mr. Bedell.

TFO Mittag also described several incidents involving Defendant and his alleged co-conspirator Mr. Loggins. In May 2019, Mr. Loggins met with Defendant for nine minutes, then immediately headed back toward St. Louis. Mr. Loggins was stopped during his return and found to be in possession of $15,000 in currency. In July 2019, Mr. Loggins travelled from St. Louis to Springfield, met briefly with Defendant, then immediately returned to St. Louis. In August 2019,

Mr. Loggins again travelled from St. Louis to Springfield, and upon arrival met Defendant at 3431 South Farm Road 129, then returned to St. Louis the next day. Finally, in September 2019, Mr. Loggins was travelling from St. Louis to Springfield when he was stopped and found to be in possession of 496 grams of heroin, which was seized. Upon his release, Mr. Loggins continued to Springfield, where phone calls indicate he met with Defendant, then returned to St. Louis. A few days after this incident, Mr. Bedell confirmed that Mr. Loggins was his source of heroin but had been caught and "that was that."

These four meetings all revolved around Mr. Loggins travelling from St. Louis to Springfield, meeting Defendant briefly, then returning to St. Louis shortly thereafter. And, after the May 2019 meeting, Mr. Loggins was found in possession of a large amount of money. Conversely, in September 2019, while heading to Springfield to presumably meet Defendant based on an earlier phone call, Mr. Loggins was found in possession of a large amount of heroin. These four incidents over a period of less than four months lead to the conclusion that Mr. Loggins was transporting heroin from St. Louis to Springfield to deliver to Defendant for distribution, and notably, support the conclusion that Mr. Loggins delivered heroin to Defendant during their August 2019 meeting at 3431 South Farm Road 129.

TFO Mittag further describes a series of phone calls coupled with a meeting by Mr. Bedell with Defendant at 3431 South Farm Road 129 to "handle some business" on September 3, 2019, leading to the conclusion that Mr. Bedell had picked up heroin from Defendant at 3431 South Farm Road 129 to sell to customers.

TFO Mittag also describes two meetings between Defendant and an unknown woman at 3431 South Farm Road 129. In the first brief meeting, they conducted a hand-to-hand transaction in the driveway, which led TFO Mittag to believe Defendant had sold heroin to the unknown

17

woman. In the second meeting, also brief and in the driveway, TFO Mittag believed Defendant gave the unknown woman money based on an earlier phone call between them, although no hand-to-hand transaction was actually observed. TFO Mittag noted that Defendant had no legitimate source of income, which supports the conclusion that the money he lent to her was proceeds from the sale of drugs and that additional proceeds would be found inside his residence.

Lastly, TFO Mittag described how after Mr. Loggins was arrested, Defendant secretively prepared for a trip to St. Louis, then made a short trip to St. Louis in early November. Defendant returned from this short trip directly to 3431 South Farm Road 129 and shortly thereafter conducted two coded phone conversations indicating he had obtained heroin in St. Louis and was ready to sell to customers.

Considering all of these circumstances set forth in the warrant affidavit, along with TFO Mittag's opinion regarding the import and meaning of these circumstances based on his extensive training and experience as to the investigation of illicit drug distribution, the undersigned concludes that the warrant affidavit sufficiently establishes a nexus between evidence of the conspiracy to distribute heroin and/or fentanyl and contraband or fruits of the crime, and Defendant's residence at 3431 South Farm Road 129. TFO Mittag sets forth a substantial amount of information in the warrant affidavit supporting the conclusions that Defendant was distributing heroin with Mr. Bedell, that he was receiving heroin for distribution from Mr. Loggins, that he met with Mr. Loggins to receive heroin three times, once at 3431 South Farm Road 129, that he delivered heroin to Mr. Bedell at 3431 South Farm Road 129, that he sold heroin to the unknown female in the driveway of 3431 South Farm Road 129, and that he later travelled to St. Louis to obtain heroin.

Defendant's argument would appear to require first viewing the incidents which took place at 3431 South Farm Road in isolation and ignoring all of the circumstances which surround those specific incidents and provide context, and then assessing whether it was a certainty that contraband or evidence of a crime would be found there. This, however, is not the standard, as the issuing judge is to look at "all the circumstances set forth in the affidavit before him" to consider whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Viewing all of the information set forth in the warrant affidavit, the undersigned finds there was a fair probability that evidence of the suspected crimes and contraband, such as drugs, firearms, and proceeds from drug sales, would be found at 3431 South Farm Road 129. Accordingly, the undersigned concludes that the warrant was supported by probable cause, and the motion should be denied as to this basis.

## C. Good faith exception

Even if the search warrant lacked probable cause, TFO Mittag acted in good faith pursuant to *United States v. Leon*, 468 U.S. 897, 921 (1984). Under the *Leon* good faith exception, the Fourth Amendment's exclusionary rule does not bar the admission of evidence if the "officers executing an invalid search warrant did so in good faith*." United States v. Ortiz-Cervantes*, 868 F.3d 695, 702 (8th Cir. 2017). "The 'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization.'" *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quoting *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)). There are four situations to consider in assessing whether an officer acted in good faith:

> (1) the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit supporting the warrant is so lacking in

indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Dickerman*, 954 F.3d 1060, 1065 (8th Cir. 2020) (emphasis removed).  Further, "When assessing the objective [reasonableness] of police officers executing a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Proell*, 485 F.3d at 431 (quoting *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001)) (internal quotations omitted).

As follows, TFO Mittag acted in good faith, even if the warrant lacked probable cause, and as a result the evidence obtained from the search of the residence should not be suppressed.

### 1.      False statements

An officer's reliance on a warrant is unreasonable if the affidavit "contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge." *Dickerman*, 954 F.3d at 1065.  Here, there is no evidence that the affidavit contained any false statements or omissions made deliberately or with reckless disregard for the truth.  As discussed above, although the application did include one omission, the statement by the unknown woman that she couldn't stay long because she had to go to the gym, this statement was not omitted with the intent to make, or in reckless disregard of whether the omission made, the warrant affidavit misleading, nor was it a material omission.  Accordingly, this situation is not present, supporting the conclusion that TFO Mittag acted in good faith.

### 2.      Abandonment of judicial role

An officer's reliance on a warrant is unreasonable if the issuing judge "wholly abandoned his judicial role in issuing the warrant." *Id*.  "A judge abandons his or her judicial role when he or she 'does not serve as a neutral and detached actor, but rather as a rubber stamp for the police and

an adjunct law enforcement officer.'" *Ortiz-Cervantes*, 868 F.3d at 703 (quoting *United States v. Long*, 797 F.3d 558, 567 (8th Cir. 2015)). Examples of abandonment include not reading the warrant or not recognizing the application was either unsigned or failed to identify the property to be searched. *Dickerman*, 954 F.3d at 1067; *Ortiz-Cervantes*, 868 F.3d at 703. Also, a judge violates the obligation to be neutral if he has a "pecuniary interest in issuing the warrant" or has "actively participated in the police investigation." *Dickerman*, 954 F.3d at 1067-68.

Here, there is no evidence the issuing judge abandoned his judicial role as a neutral and detached actor. The affidavits and the warrant were signed. There is no evidence that the issuing judge had any conflict of interests or actively participated in the investigation. Thus, this situation is also not present, again supporting the *Leon* good faith exception.

### 3. Indicia to support probable cause

Reliance on the warrant would not be in good faith if the affidavit in support is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable.*" *Id.* at 1065 (emphasis in original). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Puckett*, 466 F.3d at 630 (quoting *Leon*, 468 at 921). Further, a "consistent finding of probable cause by every judge who independently reviewed the affidavit, satisfies us that the affidavit bore sufficient indicia of probable cause to render the investigating officers' reliance on it objectively reasonable." *United States v. Ross*, 487 F.3d 1120, 1124 (8th Cir. 2007).

Here, the affidavit provided sufficient indicia to make the reasonable belief that probable cause was established. The affidavit was reviewed and approved by the issuing judge. TFO Mittag is not an attorney, so his reliance on the determinations made by AUSA Black and the issuing

judge was reasonable. Additionally, as discussed in the probable cause section of this report, the undersigned finds that the warrant affidavit established probable cause.

### 4. Facially deficient warrant

Lastly, reliance on a warrant is unreasonable if "the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid." *Dickerman*, 954 F.3d at 1065. A warrant is facially deficient when it "fail[s] to particularize the place to be searched or the things to be seized..." *United States v. Carpenter*, 341 F.3d 666, 673 (8th Cir. 2003) (quoting *Leon*, 468 U.S. at 923) (internal quotations omitted). Further, the warrant's level of ambiguity is indicative of whether it is facially deficient. *Id*.

Here, the warrant was not so facially deficient that TFO Mittag could not presume it to be valid. The warrant specifically identifies the place to be searched as well as the contraband sought. As a result, the warrant was not facially deficient, again supporting good faith reliance.

### 5. Conclusion

Based on the foregoing, even if the warrant lacked probable cause, the law enforcement officers acted in good faith in executing the warrant. Accordingly, the *Leon* good faith exception applies, and the evidence obtained from the warrant should not be suppressed.

### D. Fruit of the poisonous tree

Defendant also seeks the suppression of any statements made subsequent to and in connection with the warrant, assumedly as fruit of the poisonous tree. Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As discussed, however, the search was made pursuant to a valid search

22

warrant that was supported by probable cause.  As a result, the search was lawful, and any fruit of the poisonous tree contention fails.

## IV.    Recommendation

For the above reasons, it is hereby **RECOMMENDED** that the Motion to Quash Search Warrant and Suppress Evidence on the Basis of an Unlawful Search and Seizure under the Fourth Amendment to the United States Constitution be **DENIED**.

/s/ David P. Rush
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE: November 1, 2021